THE STATE VS. RUSSEL CALVIN, SAMUEL JONES & HENRY J. HOWELL, OTHERWISE CALLED JOHN BISHOP.

## Indictment for passing Counterfeit Forged Notes.

The 49th Sec. of the 6th Div. of the penal code of Georgia prescribes the punishment to be inflicted on a person who shall falsely and fraudulently make, sign or print, &c. any *counter-feit* note or bill of a bank, &c. The 52d. Sec. declares, that if any person shall falsely and fraudulently pass, pay, &c. any false, forged, counterfeit or altered note *as* aforesaid, &c. *Held*, that the latter section must be taken in connexion with the former—that the term *counterfeit* was sufficient without the addition of the words " in imitation of" " or purporting to be"—and that there was no repugnancy or inconsistency in the sections.

An indictment must pursue the very words of the statute, upon which it is founded.

But it is sufficient, if the counts taken collectively pursue the words.

The indictment charged that the counterfeit bill was a note purporting to be a note of the P. & M. Bank of So. Ca. which was the name given by the charter ; the tenor of the note as set forth, was "The President, Directors & Co. of the P. & M. Bank of So. Ca." : *Held*, that the addition of the words " The President, Directors & Co." in the note, was a mere designation of the persons composing the corporation who made themselves liable for the payment of the note, and that there was no variance or repugnancy between the tenor and purport.

A Bank bill issued by an institution taking its franchises from State authority for the mere legal conveniences of a corporate body, is not a *bill* of *credit*, within the inhibition of the Constitution U. S.

In an indictment for forgery it is not necessary to allege an intention to defraud, where the statute, upon which such indictment is founded, does not contain these terms—such intention is embraced in the words " falsely and fraudulently."

Where principal and accessory in a felony are jointly indicted, it is a matter of discretion with the Solicitor General, whether they shall be jointly or severally tried, particularly, when they have joined in the general issue.

An accessory jointly indicted with principal in a felony, may be a witness for the State, but *it seems* not for the prisoner.

Where the charter of a bank required that certain acts should be performed, before it should be considered as incorporated—proof that its bills were received by the public officers of the State granting the charter, in payment of public debts, and that such bills were in general circulation in said State, held sufficient evidence on an indictment for counterfeiting its bills, that the conditions had been complied with, and that the bank was an " incorporated Bank."

On an indictment founded on a statute, for the forgery of a bank note, it is sufficient to prove it counterfeit by proof of any imperfections. It is not indispensably necessary to disprove the hand writing of the payee or President. One skilled in the matter is competent to prove by

a comparison with a genuine bill, that the note, the subject matter of the indictment, is a counterfeit.

Presumptive evidence will be received in proof of any fact involved in a criminal prosecution.

If the evidence raises a violent presumption that the offence for which the prisoner is indicted, was committed in the county where he is tried—it is sufficient.

The penal code of Georgia prescribes the punishment for counterfeiting, &c. the note of any incorporated bank " whose notes *are* in circulation in this State." Is the word " *are*" to be construed as relating only to banks, whose bills were in circulation in this State at the time of the *passage of the act.—Quære.*

## By CHARLTON, Judge.

THE first indictment preferred and found against these persons charges in the *first* count, *Russell Calvin,* with the offence of *falsely* and *fraudulently passing* a counterfeit note, purporting to be a note of an incorporated Bank, which notes are in circulation in the State of Georgia; and it further charges in the form of a distinct accusation, *Samuel Jones, Henry J. Howell,* otherwise called *John Bishop,* with being severally accessories, advising and encouraging *Russell Calvin* in and to the perpetration of the felony. The *second* count charges *Russell Calvin,* with having committed the offence of *falsely* and *fraudulently* altering a counterfeit note, purporting to be a counterfeit note of an incorporated Bank, whose notes are in circulation in this State. Another accusation is appendant to this Court, charging *Samuel Jones* and *Henry J. Howell* with severally being accessories, feloniously advising and assisting in, and to the felony of this Count. There is a *third* count, which charges *Russell Calvin* with having committed the offence of *falsely* and *fraudulently tendering* in payment, a counterfeit note, purporting to be a note of an incorporated Bank, whose notes are in circulation in this State, and the appendix, or supplemental accusation to this Count, charges *Jones* and *Howell* with being severally accessories, advising and encouraging *Calvin,* in and to the perpetration of the crime.

[State vs. Calvin, et. al.]

The Grand Jury, upon these accusations against *Calvin*, as principal, and *Jones* and *Howell*, as accessories, returned "True Bill." The prisoners were arraigned—upon that arraignment pleaded "Not Guilty"—and the usual issue being joined by Mr. *Solicitor General*, they were on their trial by the Petit Jury, found "Guilty." Another bill had been preferred against them, charging in the *first* count, *Russell Calvin*, with the offence of *falsely* and *fraudulently* passing a counterfeit note, purporting to be a note of an incorporated Bank, whose notes are in circulation in the State of Georgia ; with the additional accusation as charged in the *first* count, of the first indictment. The *second* count of this indictment is the same as in the first indictment with a similar charge, against *Jones* and *Howell*, as accessories. The *third* count, of this indictment, charges *Russell Calvin* with having committed the offence of falsely and fraudulently passing a *forged* note of a Bank, whose notes are in circulation in this State ; and to this count is likewise added, in the form of a distinct accusation, a charge against *Jones* and *Howell*, with being severally accessories, advising and encouraging the principal, *Calvin*, in and to the perpetration of the felony. In all the accusations, the appendices of the primary counts of both indictments, the prisoners, *Jones* and *Howell*, are charged, as accessories *before* the fact or perpetration of the felony. Upon this indictment the Grand Jury returned "True Bill." The prisoners were arraigned, as upon the other, plead "Not Guilty"—and upon which Mr. *Solicitor General* joined issue. The Petit Jury returned a verdict of "Guilty," against *Calvin* and *Jones*, and of "Not Guilty," against *Howell*. Motions are now submitted in *arrest* of *judgment*, assailing and associating the intrinsic defects of each of these indictments, and for a new trial, for reasons *dehors* the record, if the causes assigned in arrest of judgment, should be overruled, or deemed insufficient by this Court. The following reasons, why the judgment should be arrested, are assigned and placed in the following order, in the notice served on Mr. *Solicitor*

PART I.—U.

[State vs. Calvin, et. al.]

*General.* 1*st.* Because the 52d Sec. of the 5th Div. of the penal code, is inconsistent, repugnant, and void.* 2*d.* Because the indictment doth not pursue the words of the Act. 3*d.* Because the purport and tenor of the bill laid in the indictment, is inconsistent and repugnant. 4*th.* Because the indictment does not charge *intention* to defraud any person, or body politic or corporate. 5*th.* Because the indictment charges the prisoner, *Russell Calvin*, with passing and altering a forged note, purporting to be a note of the Planters' and Mechanics' Bank of South Carolina, and avers, that the said Bank, is an incorporated Bank, of the State of South Carolina, when no State, can constitutionally charter a Bank, with powers to issue bills of credit, and a Bank bill, or note, is within the true intent and meaning of the Constitution of the United States, a bill of credit. 6*th.* Because the prisoners were refused by the Court the legal right of severing in their defence, and were coerced to go to trial jointly.

The accusation against the prisoners is founded on the 52d Sec. of the 6th Div. of the penal code of Georgia, which is in these words : "If any person shall falsely and fraudulently, pass, pay, or tender in payment, utter or publish, any false, forged, counterfeit or altered notes, bill, check, or draft, *as aforesaid,* knowing the said to have been falsely and fraudulently forged, counterfeited, or altered, the person so offending, shall, upon conviction, be punished by imprisonment at hard labor, or in solitude, in the penitentiary, for any time, not exceeding ten years." This section must be taken in connexion with the 49th, which enacts :† "If any person shall falsely and fraudulently make, sign, or print, or be connected in the false and fraudulent making, signing, or printing, any counterfeit note, or bill of a Bank of this State, or

---

* The 6th Sec. of the *seventh* division of the penal code passed 23d December, 1833, is in the same words with the section above referred to.

† The 3d Sec. of the *seventh* divison of the penal code of 1833, is the same, with the section above referred to.

the note, or bill, of any incorporated Bank, whose notes or bills are in circulation in this State, or falsely and fraudulently cause, or procure the same to be done, said person, on conviction, shall be punished, by imprisonment in the penitentiary, at hard labor, or solitude, for any period, not exceeding ten years." 1st. The first cause assigned in arrest of judgment is, that this 52d section of the penal code, thus extracted, and placed in connexion with the 49th section, is inconsistent, repugnant and therefore void. This objection has been pressed upon my attention by the counsel for the accused, with great ingenuity and learning, and the first impressions imbibed, under the influence of their argument, were with some difficulty removed, by the suggestions of the counsel for the prosecution, aided by the construction, derived from the best considerations I could bestow upon it. The case of the *United States* vs. *Zebulon Cantril,* 4 *Cranch,* 167, certified, from the Circuit Court of this district, and decided in the Supreme Court, was cited, as fully supporting the alleged repugnancy of this section of the penal code of Georgia. The following are the words of the Act of Congress, upon which *Cantril* was indicted : "If any person shall utter or publish as true, any *false,* forged, or counterfeit bill, or note *issued,* by any of the Presidents, Directors & Co. of the Bank of the United States, and *signed* by the President and countersigned by the Cashier thereof, with intention to defraud the said corporation, or any other body politic, or corporation, knowing the same to be falsely altered, forged, or counterfeited, shall be deemed and adjudged guilty of felony, and being thereof convicted according to the due course of law, shall be sentenced, &c." The Reporter says, the case was submitted without argument, and MARSHALL, C. J. delivered the opinion of the Court, that the judgment ought to be arrested for the reasons assigned in the record, and these reasons were : " 1st. Because the indictment is insufficient and repugnant, inasmuch as it charges the prisoner with having altered and published as true, a certain false, forged, and counterfeit paper, partly written and

partly printed, purporting to be a Bank bill of the United States
for ten dollars, signed by *Thomas Williams*, President, and *G.
Simpson*, Cashier. 2*d.* Because the Act of Congress passed the
27th of June, 1798, entitled "An Act to punish frauds, committed
on the Bank of the United States, under which the prisoner is in-
dicted, or so much thereof as relates to the charge set forth in the
indictment, is inconsistent, repugnant and therefore void." The
judgment was arrested for these reasons, assigned in the tran-
script of the record. The absurdities involved in these reasons
are, that a man should be found guilty of the offence, of uttering
and publishing as *true*, a *false*, forged and counterfeit note, pur-
porting to be a Bank bill of the United States : but, how could
that be a false paper, purporting to be *signed*, by the legal offi-
cers of the Bank, only authorized to sign it, viz : the President
and Cashier ? and that such *false*, forged, and counterfeit note,
*was issued*, by order of the President, Directors & Co. of the
Bank of the United States ; but how could that be false, forged,
and counterfeited, thus *issued* by the corporation whose bills it
purported to be ? It required then, no legal or technical appre-
hension, no philological acumen—no application of any rule of
interpretation, instantly to perceive upon the contrast of the of-
fence charged in the indictment, with the statute upon which it
was founded, that the statute was guilty of a *felo de se ;* and thus
deprived by its own hand, of every vital principle, that could con-
fer energy upon itself—it was necessarily divested of all means,
to support the sanction, it had announced. It assumed, it is true,
the giant form and proportions of an *Act* of *Congress*, and might
therefore look terrible even in death, but yet, it might be insulted
and violated in that situation, by the merest pigmy. The intel-
lect of the Supreme Court of the United States, would certainly
not condescend to afford such explanations as these, but they are
satisfactory to my humble mind, and must be satisfactory to, and
adapted to the meridian of every, and the meanest comprehension.
Is this section, of the penal code of Georgia, also guilty of a *felo*

*de se ?* Does it bear that self immolating absurdity contained in the Act of Congress ? If so, the prisoners are not guilty, and it will become my duty to discharge them ; *Judex damnatur, cum nocens absolvitur,* will not apply to my conduct, because, the acquittal will be pronounced by the law, my sovereign, and the sovereign of us all. Mr. *Wilde* would then see illustrated, the wide, and it is to be hoped, the eternal separation, between the sovereign, LAW, in a representative democracy, and the caprice of his Eastern Sultan ; he would see the difference, in that "Beauty of Holiness" which beams from the front of one, operating with inexorable impartiality, according to the mandate of fixed principles, and the *sic volo, sic jubeo, stat pro ratione voluntas,* of the other. This will be the *third* time, I have been called upon and compelled by judicial duty, to decide upon this exception, to the indictment. Considering the Jury as judges of the law and the fact, Mr. *D'Lyon,* in his defence on the first accusation, addressed the Petit Jury, on the sufficiency of this ground, *alone,* to justify a verdict of acquittal, and that they as judges of the law and the fact, (so expressly delegated to them, by the 23d Sec. of the 11th Div. of the penal code,) were competent to consult their own opinions, on *his* construction of the section, without reference to what would be the opinion expressed by this Court. He for the first time, cited *Cantril's* case, and contended it was strictly applicable to shew, the inconsistency and repugnancy involved in this 52d Sec. of the penal code. The Jury, under the charge of the Court, which did not accede to the construction given to the section, by the counsel for the accused, (exercised, it is presumed, the full power given them, to decide upon the law and the facts,) and, returned a general verdict of guilty. On the second trial for the same accusations, (with a variance between the third count of the first indictment, and the third count of the second indictment, before referred to,) I may say with the Poet, in his allusions to Fame, *Vires acquirit eundo*—for all the strength, backed by the dexterity, science, and its concomitant ingenuity could add, were

brought forth at this trial, in aid of the argument first urged, on
this supposed fatal exception to the indictment.    Messrs. *Gordon,*
*Wayne,* and *Wilde,* in the order I have thus placed them, con-
tended for the repugnancy, with the ability that was calculated to
reach every fastness of the impressions, upon which I charged
the Jury, and to shake to its very foundation the opinion I had
given them.    These impressions, however, formed under the in-
fluence and workings of my own judgment and reflection, con-
firmed as they were, by the then satisfactory, impressive, and lu-
cid argument of Mr. *Davies,* counsel for prosecution, who dis-
posed in detail of all the difficulties presented by the opposing
counsel, assisted and illustrated as his argument was by the reply
of Mr. *Bond,* Solicitor General, I adhered to the opinion, I had
before communicated to the Jury, and they, I presume, on this
occasion, as they did on the other, exercised their right of deci-
ding upon the law and the facts, and returned a verdict of " Guil-
ty" against *Calvin* and *Jones,* and a verdict of "Not Guilty"
as to the prisoner *Howell.*    A third time, this objection, and
others associated with it, in arrest of judgment, and for a new
trial, have been discussed, and if any one supposed, after hearing
the former arguments, that nothing of novelty could be suggested
in this, he would have discovered, and discovered it with surprise,
in attending to this *ulterius consilium,* that the resources of ge-
nius are infinite, and baffle all calculations as to the amount,
which may be ever found in its exchequer.    I must be excused in
using a style, and resorting to figures, generally thought incom-
patible with the usual shrivelled and morose complexion of a
Judge's decision.    The counsel for the accused, as well as the
counsel for the prosecution, placed before me their several torches,
to light, guide, and direct me, in the path of duty, they each wished
me to pursue ; and could torpidness be now expected from me,
warmed as I have been by the blaze, so profusely shed around
me ?    The fault, if any, is with the gentlemen, and to it, I take
leave to ask for my apology.    Mr. *Harris,* with that synthetical

and convincing manner, which always accompany his arguments, answered the objections of the opposite counsel, by putting the question, as to the import of the word *counterfeit*.   What does it mean, (he enquired) in its common acceptation?   As defined by Orthodox and classical expounders of our language, and in common acceptation, it imported, an " imitation," " likeness," " resemblance."   In this acceptation it was understood, and taken by all mankind.   In reference to standard compilers of the words, forming our language, the word *counterfeit* imports nothing more. I must be permitted to name a higher authority, than any, or all quoted by the learned counsel.   My authority is the favorite of nature and the muses ;. and in thus distinguishing him, it is ascertained at once, that I can only allude to *Shakespeare*.   According to numerous quotations, from his works, which crowd upon my memory, as in *Merchant of Venice :* " What find I here, fair Portia's *counterfeit ;*" in *As you like it :* " Will then take a good heart and *counterfeit* to be a man ;" in *Hamlet :* " The *counterfeit* presentment of two brothers ;" in *Othello :* " It is a heavy night, these may be *counterfeits*."   I say, according to this catholic authority, illustrated by these quotations, the word " *counterfeit*" means what Mr. *Harris* has contended for.   In thus fixing its legitimate import, the gentlemen had two objects in view ; *1st.* To shew, that this universally received and admitted import, must have been in the contemplation of the Legislature, and intended to be given it, as inserted, and used in the 52d Sec.   And *2ly.* If so intended, inserted, and used, the word " counterfeit," *per se* conveyed every idea, that could be wished, without the addition of the explanatory expressions, " in imitation of," or, purporting to be found in British statutes, and the Act of Congress, amendatory of the defective Act in *Cantril's* case, which expressions, he considered as used in those statutes and that Act, merely *ex abundanti cautela*.   In a revision of the penal code, in 1817, with this case of *Cantril* staring them in the face, decided in 1807, and as a decision of the Supreme Court, and settled law of the nation, the

Legislature did amend the 47th Sec. and left untouched the 52d—thereby, as was urged by Mr. *Berrien*, one of the counsel for the prosecution, consecrating the extensive import in 1816, given to the term "counterfeit," and conveying with almost irresistible perspicuity, the intention of the Legislature, as to the sense and latitude in which that term was to be taken. If such appears to me, to have been the intention of the Legislature, the 38th Sec. of the penal code, authorizes me, to give it full operation. That section declares : "Every section of this code, and all its *terms* and *expressions*, shall receive a liberal construction, according to the true intent and meaning, and which may be best calculated to carry it into effect." This section has been called by one of the counsel for the prisoners, "section *kill all*," and "*cure all*," a "city of refuge," to suit the purposes of a State prosecution. If it is a "city of refuge," its gates are opened, as readily to the prosecuted as the prosecutor. They are opened, whether the application for admission be to demand justice, or to seek mercy, from a too liberal exposition of her pure and unsophisticated system of jurisprudence. The public itself may flee to it, for protection, against the assaults of an offender, who, with blood stained hands, or the property of his fellow-citizens in his possession, the fruits of his rapine, may boldly shield himself from punishment, under a strict and literal construction of the very law, *intended* for his punishment. It is obvious, therefore, that this section is not a "city of refuge," for the convenience and purposes of the prosecutor, but an asylum, a merciful sanctuary for the oppressed, the injured, or the innocent, in the character he may have assumed or have given to him, of either accuser or accused. It is a "city of refuge," therefore, not like that under the Mosaic dispensation, designated and intended for the temporary safety of a fugitive from justice, but a merciful sanctuary allowed and consecrated in a Christian republic, for the *sovereignty* itself, or the individual accused by that sovereignty ; whether it was intended by the reason and motives of the law, as

interpreted by the common sense of justice, that the former should punish, under the facts and circumstances of the offence, as defined, or described in the penal code, or, that the latter be exempted from punishment. This innovation upon the criminal law before existing, was founded upon a respect for all the absolute rights of mankind, of life, of liberty, of property, and reputation; particularly as they ought to be respected in this republic, and therefore, it was deemed by the compilers of this code, that there was no sound reason in giving a strict construction to a penal statute affecting life, or liberty, which was not as applicable to property and reputation. Hence the introduction of this section into the penal code of Georgia. Consulting this intention then, in reference to the term counterfeit, I am of the opinion, that there is no repugnancy or inconsistency in this section, and that it bears no analogy to the case of *Cantril*, adjudicated in the Supreme Court of the United States: because the penal code, does not require the establishment, that this note should be a counterfeit issued by the Bank, and signed by its President and Cashier. I have thus disposed of what I considered, and until the delivery of this opinion, considered, the most formidable objections to any sentence, I was authorized by law to pronounce upon the prisoners. It is the result of a thrice argued difficulty, and though I have fostered this code as an offspring I had contributed to bring into life, yet if the discrepancy; inconsistency and repugnancy had been as apparent, as were attempted to be shewn by the counsel for the prisoners, I would have endeavoured to imitate the Roman Magistrate, and consigned it to the lictors.

2*d*. The indictment does not pursue the words of the Act. Upon this objection I never had any doubt. The law is thus laid down: "If the indictment proceeds upon a statute, the charge must in general be set forth, in the very words of the statute describing the offence." All the authorities proclaim the same doctrine as found in the books cited by counsel. (2 *Russell* on

PART I.—V.

*crimes*, 14, 95.   2 *East*, *P. C. c.* 19, s. 58, p. 985.)   The counts
of the indictment taken collectively pursue the *very words* of the
statute, but instead of this, it is contended, (as I understand it,)
that *each* count, should contain the very words of the statute.
This is certainly not necessary, because *fraudulently passing*
any false, forged, or counterfeit note, is a substantive offence, so
is *paying* such note—so is *tendering* in payment such note—so
is *altering* such note.   If substantive offences, they may be dis-
tinctly charged.   They are so distinctly charged, and therefore,
the context of the indictment, which is the accusation, is conceived
in the *words* of the statute, and consequently complies with all
the requisitions of the authorities cited.

3*d*.   The purport and tenor of the bill laid in the indictment, is
inconsistent and repugnant.   The indictment charges, that this
was a note purporting to be a note of the "Planters' and Me-
chanics' Bank of South Carolina," and the *tenor* as set forth in
the indictment, "in words, letters, and figures marked," is a note
of the "President, Directors & Co. of the Planters' and Mechan-
ics' Bank of South Carolina."   Is not the baptismal name and
style of the corporation, alleged with perfect consistency in the
charge of the indictment and tenor of the bill as set forth in the
indictment ?   Where is the discrepancy ?   The charge in the in-
dictment is, that it is a note of the "Planters' and Mechanics"
Bank of South Carolina," so, in the tenor it appears to be, a note
of the "Planters' and Mechanics" Bank of South Carolina,"
which the "President, Directors & Co." promised to pay on de-
mand.   The first section of the Act incorporating the institution,
declares, that it shall "be held and deemed and taken as a body
corporate, by the name and style of the Planters' and Mechanics"
Bank of South Carolina."   That name and style are charged in
the indictment, and contained in the tenor, with the addition of a
*designation* of the persons composing the corporation, who made
themselves liable to the payee, under the name and style given to

the corporation, by the Legislature of South Carolina.  There is not then any material or substantial variance, or repugnancy, as contended for, particularly as was suggested by Mr. *Berrien*, under the 5th section of this Act of incorporation, a note of the description contained in the *tenor* is directed to be considered a note of the Planters' and Mechanics' Bank of Charleston, South Carolina.

*4th.* Because of the unconstitutionality of the Act of incorporation of the " Planters' and Mechanics' Bank of South Carolina." This objection was deemed sufficiently important by one of the counsel of the accused, Mr. *Wilde*, to demand, and it did accordingly put forth, some of the best efforts of his legal and political information.  The objection is founded on the 10th section of the 1st Art. of the Constitution of the United States, which declares, among other inhibitions, that " no State shall emit bills of credit." Unless then, these Bank notes, can be considered bills of credit, emitted by the State, the Constitution of the United States, is violated only by the construction—that these Bank notes, though not literally bills of credit, issued *directly* under State authority, and auspices, yet they amount to the same thing, for they are bills emitted by a *Bank*, deriving its existence, and its franchises from State authority, and therefore, the State has done that *per obliquum*, which it could not have done directly.  This was in substance the argument of counsel, and I am therefore called upon to declare this charter unconstitutional, upon what is perhaps a far fetched, and strained implication, and by one " fell swoop," not only to annihilate its operation upon this prosecution, but to destroy the charters of every Bank in this State, and at the same time to proclaim hostilities *ad internecionem*, against every State Bank of the Union.  If I should adopt the counsel's construction and do so, it might have the effect to save these men, but its other consequences, would be as innoxious, and as little regarded, as the terrors of that lava, which purports to flow, from a mock ve-

[State vs. Calvin, et. al.]

suvius of the pencil. A Judge—a State Judge particularly, is not warranted by any power that his department is clothed with, to declare an Act unconstitutional—certainly not, by the application of the common rules of interpretation, much less then, under a construction, which has resulted from a *refined* ascertainment, of the *intention* of the framers of the Constitution. On the contrary, the infraction must hurl direct and unequivocal defiance in the very teeth of the Constitution. The outrage must be so daring and open, that every one may see or feel it—so obvious and apparent, that it requires, on the contrast of the law, and the Constitution, the simple, unvarnished enunciation from the bench, "*the law is unconstitutional.*" These are the restraints, I impose, (and they are restraints, which have been imposed, I think, by the opinion of the Supreme Court of the United States,) upon the power of the judicial department of government, to declare a law unconstitutional. Applying these doctrines, to the charter of this Bank, I may be permitted to ask the question, does the Act of incorporation directly assail the 10th Sect. of the 1st. Art. of the Constitution? I answer without hesitancy, and without suffering my mind to be influenced by a doubt, that this Act of incorporation does not oppugn the Constitution of the United States. These Bank notes are not bills of credit, as meant and intended by the Constitution of the United States. A bill of credit, emitted by a State, is a bill, purporting to be *issued*, and *is* issued *directly* by State authority. It must be redeemable at its treasury—that is, its legislative Bank—signed by the *Governor* as President, the *Secretary* of *State* as Cashier, or some other officers, as intimately associated with the sovereignty of the State.* I would thus describe a bill of credit, emitted by a

---

* For the definition of the terms "bills of credit," as used in the Constitution U. S., *see Craig et. al.* vs. *State of Missouri.* (4 *Peters' S. C.* Rep. 410.) *Briscoe* vs. *the Bank of the Commonwealth of Kentucky.* (11 *Pet. S. C.* Rep. 257,) in which latter case, the definition given is, " a paper issued by the sovereign power, containing a pledge of its faith, and designed to circulate as money." p. 314.—(*Ed.*)

State, a description, which is hallowed by the contemporaneous exposition of the 10th Sect. of the 1st Art. of the Federal Compact. Where were the Banks in 1787, to which this inhibition could apply? Could the convention have been inspired, and looking down the vista of time, see these institutions, springing up, at the present epocha, like Hydra's heads? No, the convention did not intend such a prospective operation. Its object and intention were most obviously, to inhibit in *future* bills of credit, and that species of paper currency, which the exigencies of the Revolutionary War had put in circulation—had inundated the country, had become worthless, had impaired, and were even calculated to impair the credit of the different States, and if permitted to be emitted *ad libitum* by the States, would ultimately sap the foundations of the honor and credit of the whole nation. In speaking of this revolutionary currency, and its subsequent phases, it is not I hope improper, in this station, and on this occasion, to give it the passing tribute of my respect. It was one of those efforts, among others of our brave and suffering people, which contributed to free my country. It contributed to scatter on our banner, Thirteen brilliant Stars, under whose beams, our fathers, and our countrymen, fought, bled, and triumphed; and if we have now on that Banner, additional Stars of greater magnitude, we ought in gratitude to attribute their present splendor, to this, among the other efforts, of our glorious revolution. The bills of that æra, which are now only found in the Cabinet of Virtuosi, have, by this section of the Federal Constitution, a kind of sanctity thrown around them; because no other bills of a similar nature, can be emitted, and therefore our reminiscences are forever retained, of the agency, this revolutionary currency had over the destinies of the republic. Bank notes possess no analogy to the bills of credit thus meant and intended in the Constitution. The Act of incorporation, communicates franchises and attributes affording necessary legal facilities, to the operations of the Bank, but in issuing a Bank note, the

President, Directors & Co. exercise no greater right, and privilege, than they before individually possessed. Each, *before* the incorporation, could have issued a promissory note, payable at his house or counting room; and the charter therefore, only authorizes the issuing of a Bank note, or promissory note, in their aggregate capacity, with the *incidents* and *liabilities* of a *corporation*, which each of the individuals composing, or interested in that corporation, could previously have done, in his *individual capacity*. The operations of the Bank are not interfered with by State authority, its bills are redeemable at Bank, for which only the credit and capital of the stockholders are pledged, its dividends accrue to the stockholders, its bills are issued upon the faith and credit of the Bank, and in no way connected with the fiscal arrangements of the State, or blended with the State's resources. Under what aspect then, can a Bank bill issued by an institution, taking its franchises from State authority, for the more legal conveniences of a corporate body, and for the ulterior benefits of the individuals composing it, under what aspect can a Bank note, thus issued, be likened to a bill of credit, emitted by a State? It is not even " the counterfeit presentment of two brothers," there is not only no resemblance, but not the most distant family connexion. This objection, therefore, must share the fate of others preceding it in arrest of judgment, and is overruled.

5th. *Intention* to *defraud* should have been charged. Some of the most important British statutes, on the subject of forgery, omit these expressions, other statutes of equal importance contain them. The penal code of Georgia, in reference to the section, upon which these indictments are founded, and *every* other section, except the 47th, under the head of " forgery and counterfeiting," avoid the insertion of these terms, thereby establishing the distinction, which the Legislature intended, *between* the crime of "*forgery*," properly so denominated, and *counterfeiting*. The terms, " falsely and fraudulently," involve every idea of deceit,

whether practised upon an individual or body politic, and supersede the necessity of more fully designating the deceit, on the person, or body politic, the counterfeiter had an intention to defraud. The indictment substantially sets forth the offence in the words of the statute, and that is sufficient under our system of criminal jurisprudence.

The 6th ground assigned in arrest of judgment is extrinsic the record, and therefore must be considered among the causes assigned for new trials. These causes are : 1st. Because the Court coerced the prisoners to be tried jointly, and thereby deprived them of a legal privilege, and excluded legal and proper evidence. 2d. Because the Court charged the Jury, that they had nothing to do with the law. 3d. Because the Court charged the Jury, that the Planters' and Mechanics' Bank of South Carolina, was duly proved to be an incorporated Bank. 4th. Because the Court instructed the Jury, that the bills were sufficiently proved to be spurious, without disproving the hand writing of the payee, *Gibbs*, and the President, *Blackwood*. 5th. Because the Court instructed the Jury, that the 52d section of the penal code, was not repugnant, inconsistent, and void. Other reasons are founded on the admission of improper testimony, and are thus stated. 1st. By admitting the witness, *Malcomb*, to testify to a fact, of which he declared he had no knowledge, except what was derived from a book or writing called the *Register*, which was not produced. 2d. By admitting the testimony of witnesses to prove the bills spurious, who were unacquainted with the hand writing of the parties, and who could only testify to a belief, founded on a comparison of the forged and genuine bills, upon the footing of the maxim, that every one is to be believed in his own art. 3d. By admitting the mere letter of the President of the Bank, declaring the bill spurious. 4th. Because hearsay evidence was admitted, the witness, *Malcomb*, being allowed to testify, that *Gibbs* had afterwards declared his name in the bill not to be his hand writing. Other

[*State vs. Calvin,* et. al.]

grounds are urged for a new trial, founded upon the absence of all evidence to suppt the charges against prisoners. 1*st.* Because no evidence whatever was given, that the offence of *Jones* and *Howell* was committed in the county of *Chatham,* or city of *Savannah.* 2*d.* Because no evidence was given, that the Planters' and Mechanics' Bank of South Carolina, had complied with the condition upon which alone their charter was to take effect. 3*d.* Because the words of the penal code: "the bill or note of any incorporated Bank, whose notes *are* in circulation in this State," are in the present tense, and no evidence whatever was given, that the notes or bills of the Planters' and Mechanics' Bank of South Carolina, did circulate in this State on the 20th December, 1817.* I am enjoined by the Constitution of the State, to place upon the minutes the reasons of the Court, for refusing or granting a new trial, and I must perform that duty in the present case, in reference to the numerous grounds, stated in the motion, but the great labor imposed upon me by the presentation of so many bases for the motion, will scarcely admit of those detailed explanations, I should otherwise bring to the assistance of the general reasons, I may assign for my opinions. 1*st.* This Court did not coerce the prisoners to be tried jointly; it decided, that according to its opinion of the Constitution, and legal prerogatives of Mr. *Solicitor General,* it was discretionary with him, in what manner the prisoners, should be tried, whether severally or jointly. Over that discretion this Court would exercise no control, unless it infringed some established and legal right, upon which the prisoners might claim the interposition of the Court's authority.† The prisoners claimed no right, which I refused to extend to them,

---

* The 3d. Sec. of the 7th Div. of the penal code of 1833, contains the same words.

† By the 50th Sec. of the 14th Div. of the penal code of 1833, it is enacted " that when two or more defendants shall be jointly indicted for any offence, any one defendant may be tried separately, except such offences as require the action and concurrence of two or more to constitute the crime, and in such cases the defendants shall be tried jointly."

or that they were entitled to receive. If in severing, the object was, each to have his twenty peremptory challenges, (allowed to this offence by the penal code,) that object was not stated, and the fact is, that *twenty* peremptory challenges were allowed to each. If the object in soliciting separate trials, was, that each might avail himself of the testimony of the others, such testimony was incompetent, and inadmissible. Where the principal and accessory are tried together, the accessory may enter into the defence of the principal, and avail himself of every matter of fact, and every point of law, tending to his acquittal, for he is *particeps in lite*, and this sort of defence, necessarily, and directly tends to his acquittal. (*Fost.* 365. 1 *Russell* on *crimes*, p. 55.) Thus allowing the accessory, to controvert the guilt of the principal, can he be examined *ex debito justitiæ*, as a *witness* for the principal? A *particeps criminis* or accomplice, may be witness for the Crown, or here, for the State, against the prisoner, but has the prisoner the correlative right of examining the accomplice as *his* witness? I do not, until better advised, understand this to be the law. The current of authorities is opposed to it, and no cases have been cited; where the trials have been severed, for the purpose of allowing one charged with a felony, to give *testimony* in favor of others associated with him in the accusation. The information of an accomplice, taken under the requisitions of the statute *Ph. & Mary*, may be read in evidence *against* a prisoner (*Leach, C. C.* p. 12.) An accomplice *may* be admitted by the magistrates for the Crown. (*Ibid*, 115, 122, 155, 464, 478.) The distinction is, that the *State* may use the accomplice as a witness, but the prisoner cannot. Be this as it may, it is settled by the authorities, that the best and most usual course is, to indict, and try the principal and accessory together, and if so tried together, the accessory cannot ask the indulgence of not being brought to trial, until the guilt of the principal is legally ascertained. (1 *Hale,* 628. *Fost.* 365. 1 *Hale,* 623. 2 *Hawk.* c. 29, 5, 45.

*Fost.* 360.) But every difficulty contained in this ground of the motion is removed, by a reference to the plea. The prisoners, after arraignment, and before they were put on their trial, joined in the general issue, and plead "Not Guilty." The law upon that point is this : "If the principal and accessory appear together, and the principal pleads the general issue, the accessory shall be put to plead also, and that if *he* likewise plead the general issue, both may be tried by one inquest. But it seems agreed, that if the principal plead a plea in bar, or abatement, or a former acquittal, the accessory shall not be forced to answer, till that plea be determined." (2 *Hawk. P. C.* c. 29, 8, 47. 1 *Hale,* 624.) *Charnack's* case, cited from 3 *Salk.* 80, 81, and so much relied upon, only establishes the doctrine, "that if the prisoners (indicted in that case as principals,) intended to take the liberty of challenging separately the allowed number of peremptory challenges, they must be tried separately, but by joining in their challenges, induced the necessity of being tried jointly." Such was the course pursued in relation to the prisoners at this bar. 2*d.* This ground did not contain the matter of fact, and was therefore waived in the argument. 3*d.* I did instruct the Jury, that the Planters' and Mechanics' Bank of South Carolina, was duly proved to be an incorporated Bank. The evidence in support of this instruction was, 1*st.* The charter of the Bank. 2*d.* Oral proof of its notes being received by the public officers of South Carolina, in payment of debts due the State, and, 3*d.* Proof of its notes being in circulation in this State and South Carolina. 1. The charter. The first section of the Act, granting this charter, declares that the company constituting this corporation, "are hereby incorporated and held, and deemed, and taken, as a body corporate, by the name and style of the Planters' and Mechanics' Bank of South Carolina." The 2d Sec. that the said company shall continue incorporated until 1st January, 1832. Then the 10th enacting section declares : "That the Bank hereby intended to be incorporated, shall not be incorporated, or derive any bene-

fit or advantage from any of the clauses or provisions of this Act, unless it shall transfer, or cause to be transferred to the Treasurer of the lower division, for the benefit of the State, 800 shares of the stock of the said Bank, on or before the 1st day of November next." This Act is dated 20th December, 1820. The apparent incongruity in the 1st clause of the Act, and the 10th now referred to, must strike every mind. The 1st clause incorporates *absolutely* and without restriction; the 10th declares that the corporation was only *intended*, until its condition precedent, shall have been complied with. But it is not with the incongruity I have now to meddle. The question is, that notwithstanding the positive unqualified annunciation of the fact of incorporation in the first clause, that incorporation is still dependent upon proof of a compliance with the condition, and terms imposed on the incorporation by the 10th enacting clause? I am of the opinion, that sufficient proof, for all the intents and purposes of this prosecution, has been adduced, to raise presumptions ordinarily equal to positive facts, that the transfer of shares was made within the limited time by the Act; and the presumptions arise from proof, that the notes of this Bank are received in payment of taxes due the State of South Carolina, and that they are in general circulation in that State. Would a Bank with this condition, dare to put out its paper, and is it to be presumed that the State would so long have acquiesced in this bold infraction of its charter? Besides, the weight of these presumptions is almost conclusively established by a section of an amendatory Act, passed in December, 1811. It is the 4th enacting clause, in these words: " The bills or notes of the ˌPlanters' and Mechanics' Bank, originally made payable, or which shall have become payable on demand." This clause, it has been contended by the counsel for the State, particularly *Harris* and *Berrien*, is a recognition of the pre-existence, and circulation of the notes of this Bank, and consequently, an acknowledgment by the State of a compliance with the terms upon which it was intended to incorporate the Bank. I am of that

opinion    4*th.* I am still of the opinion, twice before and oftener perhaps expressed, that there was sufficient proof of the spuriousness of these bills, without disproving the hand writing of the payee *Gibbs,* or the president, *Blackwood.* Many forgeries of instruments, at common law, render proof of the signatures to the instruments indispensably necessary ; indeed, a *sine qua non* of the investigation ; for the plain reason, that every thing might depend upon the genuineness of the signatures, and nothing upon the context of the instrument.   One definition of forgery at common law is : " the fraudulent making, or alteration of a writing to the prejudice of another man's right," and " a false making, or making *malo animo,* of any written instrument, for the purpose of fraud and deceit." (2 *East. P. C.* c. 19, s. 1, p. 852, 965.)  It would seem to be necessary, (I mean generally necessary,) in prosecutions for forgery at common law, to prove the signatures of the persons charged to have been defrauded, for the purpose of proving the alteration, or other forgery committed, of a *genuine* instrument ; but *cessante ratione, cessat et ipsa lex.*  The reason of the requisition of such proof on an indictment for a common law forgery, ceaseth, on its application to the forgery of a Bank note.   It is true the signatures to a Bank note, are among its vital principles, but the genuineness of the signatures does not impress a genuine character upon the note ; and without any proof of the hand writing of the President and Cashier, it is competent, according to authority, and the reason of the thing, to prove the note a forgery, by proof of any imperfections, which may shew *aliunde* the signatures, that the note is counterfeited or forged.   This doctrine is settled by a decision of the Judges of England, in the year 1801.  (*McGuire's* case. 2 *East. P. C.* c. 19, s. 68, p. 1002.) It is a case not in hostility with any law of England, which was in force in this country previous to our revolution, or that portion of it adopted on the establishment of our independent government. On this subject, I heard with entire approbation, the suggestions of Mr. *Habersham,* to whose learning and research, I am indebted

for this case, the principles of which, however, I had before com-
municated. *Russell*, in his compilation of criminal law, vol. 2,
p. 1507, thus notices this decision : "In a case which was refer-
red to the consideration of the Judges, a conviction for forging a
Bank note, was holden good, though there had been no testimony
of the Cashier, at the trial, to disprove his hand writing, as the
forgery of the note had been proved by other evidence which
shewed that the instrument was false in all its parts, in the tex-
ture of its paper, the water mark, the engraving, the ink, and the
written date of the year, which was in 1798, though the printed
date under the Brittania was 1799, being altogether proved, to be
such, as the Bank never made or issued."

In the present cases, Mr. *Malcomb*, an officer for years past of
the Planters' and Mechanics' Bank, swore with positiveness, that
the signature of *Lukens*, the Cashier, was a forgery, that the vig-
nette encircling the word "Charleston," was a forgery, and the
number of the bill did not, and could not correspond, from his
knowledge and inspection of the Register of the Bank, with any
number issued since the incorporation of the Bank. A few bills
some years ago, were by mistake falsely numbered 200, (these
forged bills are *below* that number,) but that no mistake has since
been committed. It is altogether then in my opinion proved, that
these notes upon which the indictments are founded, are such as
the Planters' and Mechanics' Bank never issued. This opinion
rests upon the maxim, *falsus in uno, falsus in omnibus*—the un-
impeached testimony of Mr. *Malcomb*, and that of Mr. *Mayor
Morrison*, who, under the process he adopted, swore positively
to the forgery, and ascertained it at an earlier period than some
of the officers of the Bank itself. Mr. *Henry*, an officer of the
State Bank of Georgia, was enabled, by a comparison with a gen-
uine bill, to swear also, that the forged note of the second indict-
ment to which evidence was applied, was a counterfeit. As an
officer of the Bank, Mr. *Henry* was familiar and conversant with

the subject matter, and I received his testimony under the influence of the maxim, *cuique in sua arte, credendum est.* The letters from Mr. *Blackwood* to the Mayor of this city, the one acknowledging the notes to be genuine, with the exception as to the numbers, and the other retracting that acknowledgment, and declaring the notes to be entirely spurious. These letters were invoked from the Mayor's possession, by a subpœna, *duces tecum,* issued by prisoners counsel. The first acknowledging the genuineness of the bills, with the exception of the number, was read on the cross examination by the prisoners' counsel, and the other would have been read, but at that time was mislaid. It was found by the Mayor, and tendered by him the next day in the course of his examination. It was not called for by the counsel for the prisoner, and its being read as evidence, was resisted for that reason, but it was permitted by the Court, because it was a continuity of the evidence, which had been partially gone into and invoked by the subpœna *duces tecum.* I remain of the opinion, it was properly admitted : but if improperly suffered to go to the Jury, the contradictory declarations of Mr. *Blackwood,* were favorable to the case of the prisoners, and therefore cannot now be considered by me, as having influenced the Jury in their convictions. The hearsay testimony, attributed to the testimony of *Malcomb,* when speaking of the declaration of *Gibbs,* comes as a ground for granting a new trial with a very ill grace from the counsel for the prisoners, because they had before insisted upon the competency of declarations of *Gibbs* to the Mayor, as to the genuineness of the alleged bills, with the exception of the numbers, upon the ground, that he was a party to the bills in the capacity of payee and the confessions and declarations of a party to the record, are always admissible. Upon the weight of this law, the declarations of Mr. *Gibbs,* when they favored the prisoner, were admitted, and under the same authority were admitted when they operated against the prisoners. These contradictory declarations were also favorable to the case of the prisoners, and therefore could

not have influenced the Jury in the verdicts rendered.   Under this 4th assignment in the motion made for a new trial, I have noticed and overruled, with the exception of two—(the remaining grounds,) the objections in this voluminous motion, for a new trial.   And other objections and reasons assigned in the motion, not particularly adverted to, in the opinion delivered under this 4th division of the motion, will be found to have been answered in the opinion delivered on the motion in arrest of judgment: the two remaining appeals to my discretion for a new trial, are:

*1st.* That there is no evidence, that the offence of *Jones* and *Howell* was committed in the county of Chatham.

*2d.* There is no evidence, that the bills of the Planters' and Mechanics' Bank were in circulation on the 20th December, 1817.

*First.* I must confess that amidst the doubts which agitated my mind, and weighed upon my conscience, I should have felt satisfied with a verdict of acquittal of these accessories, not from any belief of their innocence, but because of my impression, that there was no direct evidence, that the offence was committed in the county of Chatham.   The Constitution requires that the offender " shall be tried in the county where the crime was committed." Is there proof in this case, that the prisoners, *Jones* and *Howell,* were accessories before the fact to the felony in the *county of Chatham ?*   It is contended by the *Solicitor General,* and the counsel associated with him, that presumption is proof, and that the whole evidence raises a violent presumption, that the crime was committed in the city of *Savannah,* a city in the *county* of *Chatham.*   The Mayor of this city deposed that these men were brought to the *Police Office* under arrest, as concerned in passing counterfeit notes.   He found in *Jones's* trunk or portmanteau, taken from the Washington Hall, a large amount of counterfeit notes.   From their own confessions they had travelled together, and two of them put up at the Washington Hall, whence they

were conducted under arrest to the *Police Office*, and it was in evidence that an intimacy subsisted between them. Mr. *Morrison* was examined and addressed as Mayor of Savannah, by the Court and by the counsel; and his reference to the *Police Office*, must have referred to the *Police Office* of the city of Savannah. If such is necessarily the reference, when speaking of his conduct, in this case as Mayor of Savannah, the Hotel kept by the witness *Newcomb*, and called the Washington Hall, must have been situated in the city of Savannah, and consequently the crime charged against the accessories, is constitutionally proven to have been in the county of Chatham, by presumption, as irresistible as positive proof; particularly, if it is recollected, that the time occupied by the Constables in obeying the mandates of the Mayor, shews that the arrest of the prisoners, could not have been at any place, beyond the limits of the county of Chatham. This was the argument of Mr. *Davies*, and he concluded by putting the question, whether such presumptions did not amount to that proof exacted by the Constitution? I can only say, that presumptions may be admitted in proof of any fact involved in a criminal prosecution, and that the Jury as Judges of the law and the fact, were authorized to decide upon the sufficiency of this evidence as to the locality of the offence. It was admitted by Mr. *Wilde*, that the English law is against the application for a new trial in a case of felony. (6 *Tm.* Rep. 625, 638. 13 *East.* 416, n. b.) and yet, without convincing me, that this is not the law of Georgia, as adopted by her penal code, I am called upon to accede to a motion which may assail the power given to the Jury as judges of the law and the facts, and to assert myself, a discretionary authority, over their verdict; which, by the law quoted by the prisoner's advocates, it is extremely doubtful if I can exercise. Upon this point I give no opinion, and it is reserved for the deliberate consideration of the Court, when it shall be presented by the State's prosecuting officer. But it shall influence me on the present occasion, among other reasons and motives, in not disturbing

the legal course of these verdicts.* My principal reason for not disturbing the verdict is, that justice has been done. *2dly.* There is no evidence that the notes of the Planters' and Mechanics' Bank, were in circulation, at the passing of the penal code in 1817. Admitting that it was the intention of the Legislature of Georgia, that it was its policy, and that the grammatical construction of the term " *are,*" confined it to the present tense, and protected notes only of incorporated Banks whose notes were in circulation in 1817, still under the opinion before expressed, these notes were at that epoch in circulation. I conclude by assenting to, and adopting the opinion of the Supreme Court of North Carolina, on a motion for a new trial, delivered by *Leavell J. :* " This being a case, where the Jury decided not against a *flagrant* violation of duty, but where there may reasonably be a difference of opinion, amongst honest men ; and it being quite certain, that justice has been done, this Court feels it unsafe to interpose, where there is a bare probability, that the accused may be innocent." (*King* vs. *Hill.* *Tm.* Rep. *No. Ca.* vol. 3, p. 211.)

It is *ordered,* that the motions in arrest of judgment, and for a new trial, be, and are hereby *overruled.*

WILDE, D'LYON, WAYNE & CUYLER, for the motions. BOND, Solicitor General, HABERSHAM, HARRIS, DAVIES & BERRIEN, against them.

---

* See also *Rex* vs. *Ball.* Russell & Ryan's crown cases (Green's Jurist Ed.) 99. But see *Graham* on *New-Trials,* p. 503 et seq. *State* vs. *Simons, Dudley's* (Geo.) Rep. 27.—(*Ed.*)